[Cite as *State v. Hodges*, 2025-Ohio-2050.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
SCIOTO COUNTY

STATE OF OHIO,                         :

    Plaintiff-Appellee,                : CASE NO. 24CA4061

    v.                                 :

ARI N. HODGES,                         : DECISION AND JUDGMENT ENTRY

    Defendant-Appellant.               :

_____

APPEARANCES:

Darren L. Meade, Columbus, Ohio, for appellant[1].

Shane A. Tieman, Scioto County Prosecuting Attorney, and Jay
Willis, Assistant Prosecuting Attorney, Portsmouth, Ohio, for
appellee.
_____
CRIMINAL APPEAL FROM COMMON PLEAS COURT
DATE JOURNALIZED:6-3-25
ABELE, J.

{¶1} This is an appeal from a Scioto County Common Pleas Court

judgment of conviction and sentence. Ari N. Hodges, defendant

below and appellant herein, assigns four errors for review:

> FIRST ASSIGNMENT OF ERROR:
>
> "THERE WAS INSUFFICIENT EVIDENCE TO CONVICT
> APPELLANT, AND APPELLANT'S CONVICTIONS WERE
> AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."

---

[1] Different counsel represented appellant during the trial
court proceedings.

SECOND ASSIGNMENT OF ERROR:

"THE TRIAL COURT COMMITTED REVERSABLE [SIC.]
ERROR BY ACCEPTING SUBMISSION OF JURY
INSTRUCTIONS AFTER CLOSING ARGUMENTS."

THIRD ASSIGNMENT OF ERROR:

"THE TRIAL COURT COMMITTED REVERSABLE [SIC.]
ERROR BY DENYING TRIAL COUNSEL'S REQUEST FOR
JURY INSTRUCTION THAT MERE PRESENCE OF AN
ACCUSED AT THE SCENE OF A CRIME, EVEN WITH
KNOWLEDGE OF THE COMMISSION OF THE CRIME, IS
NOT SUFFICIENT TO CONVICT."

FOURTH ASSIGNMENT OF ERROR:

"THE CUMULATIVE EFFECT OF THE TRIAL COURT'S
ERROR CREATED REVERSABLE [SIC.] ERROR
WARRANTING REVERSAL."

{¶2} During an October 2021 traffic stop, Ohio State Highway Patrol Trooper Nick Lewis discovered cocaine and fentanyl on a fellow passenger's person and a bag of marijuana in the center console of a rental vehicle in which appellant was the front seat passenger. A Scioto County Grand Jury later returned an indictment that charged appellant with (1) one count of trafficking in cocaine in violation of R.C. 2925.03(A)(2), a first-degree felony, (2) one count of trafficking in a fentanyl-related compound in violation of R.C. 2925.03(A)(2), a first-degree felony, (3) one

count of possession of cocaine in violation of R.C. 2925.11(A), a first-degree felony, (4) one count of possession of a fentanyl-related compound in violation of R.C. 2925.11(A), a first-degree felony, (5) one count of possessing criminal tools in violation of R.C. 2923.24(A), a fifth-degree felony, and (6) one count of possession of marijuana in violation of R.C. 2925.11(A), a minor misdemeanor.

{¶3} Appellee filed a notice of intent to introduce other acts evidence as per Evid.R. 404(B). At a January 5, 2024 hearing on the motion, appellee referred to a 2016 Cincinnati investigation that led appellant to enter guilty pleas in federal court for trafficking. In addition, appellee highlighted a current investigation into a 2022 incident in which appellant drove a rental vehicle in a high-speed pursuit, threw a bag of crack cocaine from the vehicle, led law enforcement to seize "a number of cellular phones from Mr. Hodges," and engaged in multiple phone communications that appeared related to trafficking in fentanyl. After the hearing, the trial court denied the motion and concluded that the incidents were too remote to show evidence of the same plan or scheme and use of rental cars did not establish modus operandi.

**{¶4}** At the January 8, 2024 jury trial, Ohio State Highway Patrol Trooper Nick Lewis testified that, at approximately 10 p.m. on October 12, 2021, he worked in the drug interdiction unit when he observed a southbound vehicle on U.S. 23 with a dark window tint and a Florida license plate. As the vehicle neared Mile Post 13, it crossed the white fog line. "As I pull up beside the vehicle, we're doing 70 [the speed limit in that area]. I'm entering the plate into my mobile computer. And as we're doing 70, suddenly he just takes off, accelerates his speed, which catches my attention." Lewis initiated a traffic stop around Mile Post 10. Lewis noted that the vehicle "takes about 50 seconds to stop, just almost a minute, which is unusual."

**{¶5}** Trooper Lewis stated that the Drug Enforcement Agency has identified U.S. 23 as a major drug trafficking pipeline. Lewis further explained that drug traffickers utilize rental vehicles because they are free from defects, have "good tags," are not subject to forfeiture, and are less visible in the community. However, Lewis explained that law enforcement can readily identify rental vehicles because they typically lack bumper stickers, license plate holders, and dealership tags.

**{¶6}** When Trooper Lewis approached the passenger side of the

vehicle and asked for the rental agreement, he smelled marijuana. He then asked the driver, James Freeman, to exit the vehicle, patted him down for weapons, and placed him in the back of Lewis's cruiser. Lewis inquired about the group's travel plans, and Freeman said they "were going to Huntington, West Virginia to buy groceries" for Freeman's cousin. Lewis noted that because it was already 10:00 p.m., "it'd probably be 11 o'clock by the time they got there to buy groceries for his cousin. . . who he hadn't seen in two years at Marshall . . . [s]o I got red flags going off already." In addition, when Lewis asked Freeman why he initially pulled away from him, he said, "one of the guys in the vehicle had to use the bathroom, so he was trying to hurry up and get him to a bathroom." Lewis testified that all of the vehicle occupants were from Cincinnati.

{¶7} After Trooper Lewis placed Freeman in the back of his cruiser, he approached the passenger side a second time and spoke with appellant, the front-seat passenger. When Lewis asked appellant where they were headed, appellant did not answer. When Lewis asked a second time, appellant stated they were "coming from Cincinnati," and "says Charleston, he thinks is where they're headed to. So, now I have a lot of red flags, a lot of indicators

something criminal is going on.  Three guys in a car, headed to two different places."  Lewis explained, "at this point, I know I'm going to search the vehicle because I could smell marijuana." Lewis patted down appellant and found nothing on his person.

{¶8}  Trooper Lewis asked the backseat passenger, Quentin Heard, to exit the vehicle, and during his pat down, Lewis identified contraband between Heard's buttocks.  Lewis testified that he seized three bags of apparent narcotics from Heard, and when he asked Heard if the drugs were his, he said, "they were all his."

{¶9}  Trooper Lewis also found a box of 100 sandwich baggies in the rental vehicle's glove box in front of appellant, which Lewis explained is "usually for packaging drugs."  Lewis testified that he did not find a change of clothes or personal hygiene items for any of the three occupants, just "maybe some random t-shirts." Lewis then asked Freeman for his cousin's phone number, but Freeman told him that "he didn't have a phone number for his cousin, that his cousin would call him, using some sort of - - I think he said an office phone or a payphone, but he didn't have a number."  Lewis found it "odd that they were driving from Cincinnati to Huntington at 10 o'clock at night and they didn't have a - - anyway of getting

a hold of this guy once they got down there."

{¶10} Trooper Lewis told appellant that he found narcotics on one passenger and sandwich baggies in the glove box. Appellant told him "he didn't have anything on his person. The only thing he had was the weed. I believe he made the comment about he had just gotten off work and got in the car and took off with - - with these guys."

{¶11} The lab results indicated that (1) one bag contained 49.4638 grams of fentanyl, worth approximately $6,000, (2) one bag contained 18.8480 grams of cocaine, worth approximately $1,800-1,900, and (3) one bag contained 9.7093 grams of cocaine, worth approximately $1,000. Lewis testified that these amounts are all trafficking amounts, not user amounts.

{¶12} Trooper Lewis explained that when he placed Freeman in the back of his cruiser, he sought backup because he did not have adequate space in his Chevy Tahoe to accommodate the three men. Ohio State Highway Patrol Sergeant David Stuart responded to the request and detained the other two men while Lewis searched the vehicle. However, Lewis testified that, because Stuart was a driving instructor at the time, he did not have adequate seating in his vehicle either. Lewis testified that he typically works with

8

another officer, but the lack of space in his cruiser, combined with the fact that "I assumed it was cocaine at the time of the stop . . . and our lab was running behind in 2021, and Lewis "would have to take another trooper from the Portsmouth Post off the road to help him transport," caused Lewis to decide at that time to "cut [the three men] loose and . . . [seek] a direct indictment."

{¶13} Hertz Car Rental Company Corporate Security Manager Sam Milanovich testified that Jamaine Freeman rented a 2019 Chevrolet Trax with Florida license plates on Mitchell Avenue in Cincinnati on October 6, 2021.  Freeman, the only authorized driver, rented the vehicle for one week to be returned to the same location on October 13, 2021, but he returned it on October 27, 2021, two weeks beyond the originally scheduled return date.  From October 6 to October 27, the vehicle accrued 4,834 miles.

{¶14} Quentin Heard testified that he is currently incarcerated after he changed his plea to guilty and received a two to five-year prison sentence in exchange for testifying against James Freeman and appellant.  Heard also conceded he has prior convictions for carrying concealed weapons, weapons under disability, drug possession, aggravated drug trafficking, resisting arrest, domestic violence, and driving without a license.  Heard stated that after

he got out of prison, he moved to California, but then returned in early 2021, and began to sell marijuana, then "crack cocaine, heroin, stuff like that." Heard testified that he had known Freeman for about 12-15 years and that they met through a cousin. Heard received a large inheritance in 2009, and after he spent it, he and Freeman started to get involved in the drug scene.

{¶15} On October 12, 2021, Freeman called Heard and asked if he wanted to travel to West Virginia to sell drugs because they could make more money than in Cincinnati. Freeman and appellant picked up Heard at his mother's home. Heard had known appellant for five or six years through mutual friends like Freeman. Heard said they "probably roll a joint up. . . I think Hodges rolled a joint. We had some liquor. So, it was time to hit the road." When asked if he had drugs with him, Heard replied, "Yeah. I had my - - I had my drugs on me in my ass." Heard explained, "[t]hey never in all my years of selling drugs, they never found my drugs there. I'm only going to carry enough that I know could fit in my butt." Heard also testified that he believed that everybody had drugs on them to sell that day.

{¶16} Heard testified that when Trooper Lewis pulled them over, Freeman and appellant panicked,

they had drugs on them. And they get to shuffling in the front seat, try to pour the drugs in the pop. The pop explode. And now I'm telling them pour it on the floor, man. Pour it on the floor, pour the pop on it. By the time the - - the officer get to my door, it's in the backseat. I just grabbed it.

{¶17} Heard said appellant tossed drugs back to him and told Heard to "do something with them." Heard watched Trooper Lewis remove Freeman from the vehicle, pat him down, and place him in the back of Lewis's cruiser, "so, I'm still trying to figure out what to do with them. So, I just grabbed them and . . . put them on the side of me. So, he take Hodges out, search him. So when he take me out, I just slide it in my pants." When Lewis removed him from the vehicle and patted him down, Lewis found the drugs that Heard had not concealed in his buttocks. Heard said Lewis "found the nine grams of crack. . . I had it in two separate bags . . . If I would have had it all in one bag, it probably wouldn't have fell out. So, I had it in two separate bags, because I ain't think to be pulled over. So, I tried to push it up a little more. I guess when he pulled the - - the big bag out the - - that little bag of crack fell - - fell out with it. . ."

{¶18} When asked what he said when Trooper Lewis asked if these were his drugs, Heard replied, "Yes sir. I admitted to them." When asked if that "was an accurate statement," Heard replied,

"What the - - they wasn't my drugs.  I just admitted to them because I didn't want to be labeled a snitch, or I ain't know they was going to let us go, ride back with them, or go to jail, or - - so I just said they was mine."  When asked, "[w]hat comes with being labeled as a snitch," Heard replied, "I mean, anything.  It depends on - - anything.  You can - - it could - - you could be cool.  You could get killed.  You could - - you could do - - anything could happen to you. . . You could get beat up in prison, stabbed in prison, any of that."

**{¶19}** Heard also recalled that he "just told Hodges, I'm like, man, just make sure you all get me a lawyer.  I'm like, man, I'm about to go to jail.  Man, just make sure you all get me a lawyer, and make sure I'm good."  Heard stated that in response, they said, "I got you, bro.  Don't worry.  We got you.  We ain't - - you ain't no worry."  Heard said the group planned to stay in West Virginia until they had sold their drugs, and explained that when Trooper Lewis let them leave the scene, they continued their trip to West Virginia where Heard sold the rest of the drugs he still possessed, "made like - - $900 to $1,000," and Heard's girlfriend picked him up in West Virginia.  Heard added that upon his arrest in December, Freeman and appellant did not hire an attorney for Heard, and that

other inmates were aware that he had "snitched."

**{¶20}** Ohio State Highway Patrol Crime Laboratory Criminalist Brianna Ray testified she tested the first sample with the "marquis color test" and determined that it "most likely [consisted of] cocaine." Then, Ray performed a fourier transfer infrared spectrometer (FTIR) test on the sample and positively identified it as 18.8480 grams of cocaine. For the second sample, Ray performed a gas chromatography mass spectrometry (GCMS) test and confirmed that the substance was fentanyl "with an indication of flurofentanyl. . . a fentanyl-related compound that is often seen when you have a process of making fentanyl." The substance weighed 49.4638 grams. Ray tested the final sample with the FTIR test and determined that it consisted of 9.7093 grams of cocaine.

**{¶21}** At the close of appellee's evidence, the trial court denied appellant's Crim.R. 29 motion for judgment of acquittal. After deliberation, the jury found appellant guilty of (1) trafficking in cocaine in violation of R.C. 2925.03(A)(2), a third-degree felony (amount equal to or exceeding 10 grams but less than 20 grams), (2) trafficking in a fentanyl-related compound in violation of R.C. 2925.03(A)(2), a first-degree felony (amount equal to or exceeding 20 grams but less than 50 grams), (3)

13

possession of cocaine in violation of R.C. 2925.11(A), a third-degree felony (amount equal to or exceeding 10 grams but less than 20 grams), (4) possession of a fentanyl-related compound in violation of R.C. 2925.11(A), a first-degree felony (amount equal to or exceeding 20 grams but less than 50 grams), (5) possessing criminal tools in violation of R.C. 2923.24(A), a fifth-degree felony (2019 Chevrolet Captiva rental vehicle used in the commission of the felonies), and (6) possession of marijuana in violation of R.C. 2925.11(A), a minor misdemeanor.

**{¶22}** At the sentencing hearing, appellee agreed that the trafficking and possession convictions should merge and elected to proceed with the trafficking counts. The trial court considered the pertinent sentencing statutes and factors, merged Counts 1 and 3 for purposes of sentencing, and proceeded to sentence on Count 1 trafficking in cocaine, and merged Counts 2 and 4 for purposes of sentencing, and proceeded to sentence on Count 2 trafficking in a fentanyl-related compound. The court observed that appellant committed these offenses while on federal parole and had prior felony convictions in both state and federal court and prior misdemeanor convictions in state court. The court further concluded that consecutive sentences are necessary to protect the

public from future crime by appellant.

{¶23} The trial court sentenced appellant to (1) serve a 24-month prison term on Count 1, (2) serve a mandatory minimum of 10-years to an indefinite maximum of 15 years on Count 2, (3) serve a 6-month prison term on Count 5, (4) pay a $150 fine on Count 6, (5) serve Counts 1 and 2 consecutively with each other, and Count 5 concurrently with the sentence in Count 2, for a minimum prison term of 12-years with 10 years being mandatory, to an indefinite maximum prison term of up to 17 years, (6) serve a mandatory 2-5 year postrelease control term, (7) pay a $20,000 fine, and (8) pay costs. This appeal followed.

I.

{¶24} In his first assignment of error, appellant asserts that sufficient evidence does not support his convictions and that his convictions are against the manifest weight of the evidence.

Standard of Review

{¶25} As a threshold matter, because appellant challenges both the sufficiency of the evidence and the manifest weight of the evidence, we initially address both standards of review.

{¶26} A claim of insufficient evidence invokes a due process concern and raises the question whether the evidence is legally sufficient to support the verdict as a matter of law. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997), syllabus; *State v. Blevins*, 2019-Ohio-2744, ¶ 18 (4th Dist.). When reviewing the sufficiency of the evidence, an appellate court's inquiry focuses primarily on the adequacy of the evidence; that is, whether the evidence, if believed, could reasonably support a finding of guilt beyond a reasonable doubt. *Id.* at syllabus. The standard of review is whether, after viewing the probative evidence and inferences reasonably drawn therefrom in the light most favorable to the prosecution, any rational trier of fact could have found all the essential elements of the offense beyond a reasonable doubt. *E.g., Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Jenks*, 61 Ohio St.3d 259, 273 (1991).

{¶27} Furthermore, under the sufficiency of the evidence standard a reviewing court does not assess "whether the state's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction." *Thompkins*, 78 Ohio St.3d at 390 (Cook, J., concurring). Therefore, when reviewing a sufficiency of the evidence claim, an appellate court

must construe the evidence in a light most favorable to the prosecution. *See, e.g., State v. Hill*, 75 Ohio St.3d 195, 205 (1996); *State v. Grant,* 67 Ohio St.3d 465, 477 (1993). A reviewing court will not overturn a conviction on a sufficiency of the evidence claim unless reasonable minds could not reach the conclusion the trier of fact did. *State v. Tibbetts*, 92 Ohio St.3d 146, 162 (2001); *State v. Treesh*, 90 Ohio St.3d 460, 484 (2001).

**{¶28}** "Although a court of appeals may determine that a judgment of a trial court is sustained by sufficient evidence, that court may nevertheless conclude that the judgment is against the weight of the evidence." *Thompkin*s, 78 Ohio St.3d at 387. "The question to be answered when a manifest weight issue is raised is whether 'there is substantial evidence upon which a jury could reasonably conclude that all the elements have been proved beyond a reasonable doubt.' " *State v. Leonard*, 2004-Ohio-6235, ¶ 81, quoting *State v. Getsy*, 84 Ohio St.3d 180, 193–194 (1998), citing *State v. Eley*, 56 Ohio St.2d 169 (1978), syllabus. A court that considers a manifest weight challenge must " 'review the entire record, weigh the evidence and all reasonable inferences, and consider the credibility of witnesses.' " *State v. Beasley*, 2018-Ohio-493, ¶ 208, quoting *State v. McKelton*, 2016-Ohio-5735, ¶ 328.

However, the reviewing court must bear in mind that credibility generally is an issue for the trier of fact to resolve. *State v. Issa*, 93 Ohio St.3d 49, 67 (2001); *State v. Murphy*, 2008-Ohio-1744, ¶ 31 (4th Dist.). " 'Because the trier of fact sees and hears the witnesses and is particularly competent to decide "whether, and to what extent, to credit the testimony of particular witnesses," we must afford substantial deference to its determinations of credibility.' " *Barberton v. Jenney*, 2010-Ohio-2420, ¶ 20, quoting *State v. Konya,* 2006-Ohio-6312, ¶ 6 (2d Dist.), quoting *State v. Lawson*, 1997 WL 476684 (2d Dist. Aug. 22, 1997).

**{¶29}** Thus, an appellate court will generally defer to the trier of fact on issues of evidence weight and credibility, as long as a rational basis exists in the record for the fact-finder's determination. *State v. Picklesimer*, 2012-Ohio-1282, ¶ 24 (4th Dist.); *accord State v. Howard*, 2007-Ohio-6331, ¶ 6 (4th Dist.) ("We will not intercede as long as the trier of fact has some factual and rational basis for its determination of credibility and weight."). Accordingly, if the prosecution presented substantial credible evidence upon which the trier of fact reasonably could conclude, beyond a reasonable doubt, that the essential elements of the offense had been established, the judgment of conviction is not

against the manifest weight of the evidence. *Accord Eastley v. Volkman*, 2012-Ohio-2179, ¶ 12, quoting *Thompkins*, 78 Ohio St.3d at 387, quoting Black's Law Dictionary 1594 (6th Ed.1990) (a judgment is not against the manifest weight of the evidence when " ' "the greater amount of credible evidence" ' " supports it).

{¶30} Consequently, when an appellate court reviews a manifest weight of the evidence claim, the court may reverse a judgment of conviction only if it appears that the fact-finder, when it resolved the conflicts in evidence, " 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *Thompkins*, 78 Ohio St.3d at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983); *accord McKelton* at ¶ 328. Finally, a reviewing court should find a conviction against the manifest weight of the evidence only in the " 'exceptional case in which the evidence weighs heavily against the conviction.' " *Thompkins*, 78 Ohio St.3d at 387, quoting *Martin*, 20 Ohio App.3d at 175; *accord State v. Clinton*, 2017-Ohio-9423, ¶ 166; *State v. Lindsey*, 87 Ohio St.3d 479, 483 (2000).

{¶31} In the case sub judice, appellant does not dispute the minor misdemeanor marijuana offense and concedes that he owned and

possessed the marijuana.  However, appellant contends that he did not constructively possess or traffick in the narcotics associated with co-defendant Heard, nor did he use the rental vehicle as a criminal tool.  Appellant argues that (1) he did not rent the vehicle, (2) he did not drive the vehicle, (3) no evidence suggests that he knew of the trip's purpose, (4) no evidence proves that appellant knew Heard possessed narcotics, (5) no evidence suggests that appellant knew about or owned the box of plastic bags found in the glove compartment, and (6) Heard's plea agreement made his testimony suspect.

**{¶32}** Appellee, however, argues that Heard's uncontroverted testimony established that all three occupants possessed narcotics, intended to "make some money," via trafficking, and appellant threw his drugs into the backseat when Trooper Lewis initiated the traffic stop.

### Possession

**{¶33}** R.C. 2925.11(A) sets forth the essential elements of the offense of possession of drugs.  The statute provides: "No person shall knowingly obtain, possess, or use a controlled substance or a controlled substance analog."

R.C. 2901.22(B) defines when a person acts knowingly:

> A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when a person is aware that such circumstances probably exist. When knowledge of the existence of a particular fact is an element of an offense, such knowledge is established if a person subjectively believes that there is a high probability of its existence and fails to make inquiry or acts with a conscious purpose to avoid learning the fact.

**{¶34}** Whether a defendant knowingly possessed a controlled substance "is to be determined from all the attendant facts and circumstances available." *State v. Teamer*, 82 Ohio St.3d 490, 492 (1998); *accord State v. Corson*, 2015-Ohio-5332, ¶ 13 (4th Dist.) To establish knowing possession of a controlled substance under R.C. 2925.11(A), the state is not required to prove that "a defendant knew the specific characteristics of the item possessed that made it" a controlled substance. *State v. Jordan*, 89 Ohio St.3d 488, 494 (2000); *accord State v. Williams*, 2005-Ohio-1597, ¶ 34 (2d Dist.).

**{¶35}** "Possession of drugs can be either actual or constructive." *State v. Bustamante*, 2013-Ohio-4975, ¶ 25 (3d Dist.), citing *State v. Cooper*, 2007-Ohio-4937, ¶ 25 (3d Dist.), citing *State v. Wolery*, 46 Ohio St.2d 316, 329 (1976). " 'Actual possession exists when the circumstances indicate that an individual has or had an item within his immediate physical

possession.' " *State v. Kingsland*, 2008-Ohio-4148, ¶ 13 (4th Dist.), quoting *State v. Fry,* 2004-Ohio-5747, ¶ 39 (4th Dist.). "Constructive possession exists when an individual knowingly exercises dominion and control over an object, even though that object may not be within his immediate physical possession." *State v. Hankerson*, 70 Ohio St.2d 87, (1982), syllabus; *State v. Brown*, 2009-Ohio-5390, ¶ 19 (4th Dist.). For constructive possession to exist, the state must show that the defendant was conscious of the object's presence. *Hankerso*n, 70 Ohio St.2d at 91; *Kingsland* at ¶ 13; *accord State v. Huckleberry*, 2008-Ohio-1007, ¶ 34 (4th Dist.); *State v. Harrington*, 2006-Ohio-4388, ¶ 15 (4th Dist.); *Criss v. City of Kent*, 867 F.2d 259, 263 (6th Cir. 1988) ("Ohio law is clear that a suspect can be in 'constructive possession' of * * * property without having actual physical possession of the property if it is located within premises under the suspect's control and he was conscious of its presence.").

{¶36} Both dominion and control, and whether a person was conscious of the object's presence, may be established through circumstantial evidence alone. *E.g., Brown* at ¶ 19; *see, e.g., State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph one of the syllabus ("[c]ircumstantial evidence and direct evidence inherently

possess the same probative value"); *State v. Davis,* 2018-Ohio-4268, ¶ 50 (3d Dist.)(prosecution may establish constructive possession by circumstantial evidence alone.). "Circumstantial evidence is defined as '[t]estimony not based on actual personal knowledge or observation of the facts in controversy, but of other facts from which deductions are drawn, showing indirectly the facts sought to be proved. . .' " *State v. Nicely*, 39 Ohio St.3d 147, 150 (1988), quoting Black's Law Dictionary 221 (5th Ed.1979).

{¶37} Furthermore, to establish constructive possession, the state need not show that the defendant had "[e]xclusive control" over the contraband. *State v. Tyler*, 2013-Ohio-5242, ¶ 24 (8th Dist.), citing *State v. Howard*, 2005-Ohio-4007, ¶ 15 (8th Dist.), citing *In re Farr*, 10th Dist. Franklin No. 93AP-201, 1993 WL 464632, *6 (Nov. 9, 1993) (nothing in R.C. 2925.11 or 2925.01 states that illegal drugs must be in sole or exclusive possession of accused at time of offense). Instead, " '[a]ll that is required for constructive possession is some measure of dominion or control over the drugs in question, beyond mere access to them.' " *Howard* at ¶ 15, quoting *Farr* at *6. Thus, simply because others may have access to the contraband, in addition to the defendant, does not mean that the defendant "could not exercise dominion or control

over the drugs." *Tyler* at ¶ 24; *accord State v. Walker*, 2016-Ohio-3185, ¶ 75 (10th Dist.) because multiple persons may have joint constructive possession of an object. *State v. Philpott*, 2020-Ohio-5267, ¶ 67 (8th Dist.); *Wolery*, 46 Ohio St.2d at 332, 329 ("[p]ossession * * * may be individual or joint" and "control or dominion may be achieved through the instrumentality of another"); *State v. Russell,* 2022-Ohio-1746, ¶ 43 (4th Dist.).

> Although a defendant's mere proximity is in itself insufficient to establish constructive possession, proximity to the object may constitute some evidence of constructive possession. *Fry* at ¶ 40. Thus, presence in the vicinity of contraband, coupled with another factor or factors probative of dominion or control over the contraband, may establish constructive possession.

*Kingsland*, 2008-Ohio-4148, at ¶ 13.

{¶38} Although appellant contends that appellee adduced no evidence to prove constructive possession, we note that appellee adduced evidence that (1) appellant rode in a rental vehicle with two other men, (2) the car traveled on a known drug corridor, (3) appellant and the driver gave conflicting answers in response to the question, "where are you headed," (4) codefendant Heard testified that when Trooper Lewis stopped them, the driver and appellant panicked because "they had drugs on them," (5) codefendant Heard testified that appellant and the driver tried to

pour their drugs into "pop" on the floor of the vehicle," and (6) codefendant Heard testified that appellant "tossed them [the drugs] back to" him in the backseat and told Heard to "do something with them."

**{¶39}** Thus, when Trooper Lewis found drugs on Heard's person, it is reasonable for the jury to conclude that appellant constructively possessed those drugs. *See State v. Davis,* 2018-Ohio-4368 (3d Dist.)(constructive possession requires ability to exercise dominion and control over item, even without immediate physical possession; readily usable drugs in close proximity to accused can constitute sufficient circumstantial evidence to support constructive possession); *State v. Dues*, 2014-Ohio-5276 (8th Dist.)(constructive possession proven via circumstantial evidence after delay in opening apartment door and codefendant threw drugs off of defendant's balcony); *State v. McClain*, 2020-Ohio-1436 (3d Dist.)(mere proximity to drugs is insufficient to establish constructive possession, but proximity combined with other factors indicative of dominion or control, such as furtive movements, can support a finding of constructive possession); *State v. Fulton*, 2024-Ohio-671 (7th Dist.)(readily usable drugs found in close proximity to defendant can be sufficient circumstantial

evidence for constructive possession; defendant did not own vehicle, but drugs where within reach); *State v. Dixon*, 2016-Ohio-1491, ¶ 19 (4th Dist.)(defendant driver constructively possessed drugs contained in another passenger's buttocks); *State v. Crocker*, 2015-Ohio-2538, (4th Dist.)(constructive possession of drugs carried in codefendant's vagina proven when defendant was driver of vehicle and text messages and jail phone calls proved knowledge).

**{¶40}** Further, appellant's argument that Heard alone should be responsible for the drugs does not help his position because two or more people can have constructive possession of the same object. *State v. Reed*, 2018-Ohio-4451, ¶ 20 (6th Dist.).  In other words, the fact that his fellow passengers might also have had something to do with the drugs does not preclude a finding that appellant constructively possessed them.  *See State v. Armstrong,* 2025-Ohio-771, ¶ 41 (6th Dist.).

**{¶41}** Thus, after we view the evidence in a light most favorable to appellee, this evidence, albeit circumstantial, sufficiently supported appellant's constructive possession of cocaine and fentanyl.

Trafficking

{¶42} R.C. 2925.03(A)(2) defines trafficking in cocaine/fentanyl (Counts 1 & 2):

> (A) No person shall knowingly do any of the following:
>
> (2) Prepare for shipment, ship, transport, deliver, prepare for distribution, or distribute a controlled substance or a controlled substance analog, when the offender knows or has reasonable cause to believe that the controlled substance or a controlled substance analog is intended for sale or resale by the offender or another person.

{¶43} Again, in the case sub judice, our review of the evidence reveals that (1) appellant rode in a rental vehicle, (2) down a known drug corridor, (3) appellant and the driver gave conflicting answers to the response to the question, "where are you headed," (4) appellant was or had been smoking marijuana when Trooper Lewis pulled the vehicle over, (5) appellant sat directly in front of the glove box where Trooper Lewis found a box of plastic baggies used for drug trafficking, (6) codefendant Heard testified that appellant and the driver tried to pour their drugs into "pop" on the floor of the vehicle," (7) codefendant Heard testified that appellant "tossed them [the drugs] back to" him in the backseat and told Heard to "do something with them," and (8) Trooper Lewis testified that the weight of the fentanyl and cocaine indicated "seller amounts," not "user amounts."

{¶44} Heard's testimony supported appellant's trafficking convictions.  For example, Heard stated that Freeman (the driver) called him and asked him to "go to West Virginia" and asked him, "You got some," to which Heard replied, "Yeah, I got some," which Heard acknowledged meant "drugs."  Heard testified that they went to West Virginia because it meant "more money," meaning "it's a small town, small city or whatever, and they pay big.  They going to pay more than what Cincinnati going to pay."  Heard stated that when Freeman picked him up at his mother's house, appellant was already in the vehicle.

{¶45} Heard testified that when Trooper Lewis pulled them over, "everybody" panicked and "everybody" said "they got us," including appellant.  Heard stated that Freeman "ain't pull over right away,"

> [b]ecause. . . they had drugs on them.  And then get to
> shuffling in the front seat, try to pour the drugs in the
> pop.  The pop explode.  And now I"m telling them pour it
> on the floor, man.  Pour it on the floor, pour the pop on
> it.  By the time the - the officer get to my door, it's in
> the backseat.  I just grabbed it.

{¶46} Heard explained that after that, appellant tossed his

drugs back to him because Freeman drove and appellant

> [h]e like 'do something with them.'  So, I - - I sit there for a minute, and I just end up grabbing them. . . I grabbed them off the console, put them back there with me.  I seen that he took - - he took Freeman out of the car first, searched him took him to the back of the car, patted him down, searched him.  So, I'm still trying to figure out what to do with them.  So I just grabbed them and put them - - put them on the side of me.  So, he take Hodges out, search him.  So, when he take me out, I just slide it in my pants.

{¶47} Thus, viewing the evidence in a light most favorable to appellee, sufficient evidence supported appellant's trafficking convictions.

### Possession of Criminal Tools

{¶48} In addition to possession and trafficking, the jury convicted appellant of possession of criminal tools, i.e., the rental car.  R.C. 2923.24(A) defines possession of criminal tools (Count 5): "(A) No person shall possess or have under the person's control any substance, device, instrument, or article, with purpose to use it criminally."

{¶49} The statute requires proof of both control over the item

29

and the specific intention to use it to commit a crime. *In re L.M.*, 2024-Ohio-2974 (1st Dist.). In the context of a rental vehicle, an automobile can be considered a criminal tool if a criminal defendant uses it with the intent to facilitate a crime. *State v. Hodge*, 2020-Ohio-3002, ¶ 47 (5th Dist.). Generally, the key element is control over the vehicle and the intent to use it criminally. For example, in *State v. Tell*, 2005-Ohio-1178, ¶ 25 (8th Dist.), the court found sufficient evidence to support a possession of criminal tools conviction when the defendant used his vehicle to commit a crime. Similarly, in *State v. Gibson*, 2003-Ohio-5839 (8th Dist.), the court upheld a conviction where the defendant used his car to facilitate drug transactions.

**{¶50}** However, if the person is neither the driver nor the vehicle renter, establishing control over the vehicle becomes more challenging. In *State v. McShan*, 77 Ohio App.3d 781 (Oct. 21, 1991, 8th Dist.), the Eighth District concluded that where the defendant was the front seat passenger, the driver had title to the vehicle, and nothing demonstrated that the defendant could exercise dominion or control over the vehicle, the State failed to adduce

sufficient evidence to support a possession of criminal tools conviction based on the vehicle. *Id.* at 783-784. This suggests that mere presence in the vehicle, without evidence of control or intent to use it criminally, may not be sufficient for a conviction.

**{¶51}** In the case sub judice, however, although appellant was neither the driver nor the renter of the vehicle, evidence adduced at trial through codefendant Heard's testimony established that appellant, Freeman, and Heard intended to use the rental car to travel from Cincinnati to West Virginia to sell narcotics. Thus, we conclude that viewing the evidence in a light most favorable to appellee, sufficient evidence supported appellant's possession of criminal tools conviction.

**{¶52}** Finally, appellant contends that the "actual evidence" about his alleged possession and complicity with trafficking that night was almost entirely offered by Quentin Heard, whose testimony could be biased because he testified pursuant to a plea agreement. Appellee, however, points out that the jury "was free to believe all, part, or none of the testimony of each witness," *State v.*

*Hall*, 2014-Ohio-2959, ¶ 2 (4th Dist.), and this court should defer to the jury on these evidentiary weight and credibility issues. *State v. Daniels*, 2011-Ohio-5603, ¶ 23 (4th Dist.); *State v. Abudu*, 2023-Ohio-2294, ¶ 65 (8th Dist.).  Thus, the jury may assess what weight, if any, to attribute to the testimony of each witness.

**{¶53}** To decide whether the case sub judice is an exceptional case in which the evidence weighs heavily against conviction, this court must review the record, weigh the evidence and all reasonable inferences, and consider witness credibility.  *State v. Martin*, 20 Ohio App.3d 172, 175, (1st Dist. 1983).  However, a reviewing court must bear in mind that credibility generally is an issue for the trier of fact to resolve.  *State v. Schroeder*, 2019-Ohio-4136, ¶ 61 (4th Dist.); *State v. Dunn*, 2012-Ohio-518, ¶ 16 (4th Dist.); *State v. Wickersham*, 2015-Ohio-2756, ¶ 25 (4th Dist.).  Because the trier of fact sees and hears the witnesses, an appellate court will afford substantial deference to a trier of fact's credibility determinations.  *Schroeder* at ¶ 62.  The jury has the benefit of seeing witnesses testify, observing facial expressions and body language, hearing voice inflections, and discerning qualities such

as hesitancy, equivocation, and candor. *State v. Fell*, 2012-Ohio-616, ¶ 14 (6th Dist.); *State v. Pinkerman*, 2024-Ohio-1150, ¶ 26 (4th Dist.). Thus, an appellate court may reverse a conviction only if the trier of fact clearly lost its way in resolving conflicts in the evidence and created a manifest miscarriage of justice. *State v. Benge*, 2021-Ohio-152, ¶ 28 (4th Dist.).

**{¶54}** Only in extraordinary circumstances when evidence presented at trial weighs heavily in favor of acquittal, will an appellate court overturn a conviction on the manifest weight of the evidence grounds. *State v. Ridenour*, 2023-Ohio-2713, ¶ 50 (12th Dist.). The case at bar is not one of those extraordinary cases. Here, the evidence presented at trial does not weigh heavily in favor of acquittal. Consequently, after our review of the record, we conclude that ample competent, credible evidence supports appellant's felony convictions. Thus, appellant's convictions are not against the manifest weight of the evidence. We believe appellee also satisfied its burden of persuasion.

**{¶55}** Accordingly, based upon the foregoing reasons, we overrule appellant's first assignment of error.

II.

{¶56} In his second assignment of error, appellant asserts that the trial court committed reversible error when it accepted the submission of a jury instruction after closing arguments. Apparently, before trial appellee sought a consciousness of guilt jury instruction based on Heard's testimony that appellant threw his drugs in the backseat when Trooper Lewis initiated the traffic stop. At the close of the trial court's jury instructions, appellee stated

> I want to take responsibility for this up front, because when you asked us about consciousness of guilt coming out, I had an argument that I couldn't bring back to the front of my mind, and there is ample case law on what Quentin Heard testified to. The tampering with the evidence by throwing it back and trying to conceal it is a consciousness of guilt. And I - - I don't know why I didn't think about it earlier, but when he started his first closing, I'm like, holy crap. So that's the only thing I would add is that I do feel like that consciousness of guilt instruction should be in there based on the testimony that was heard in the courtroom.

{¶57} Counsel objected and characterized the situation as, "a little bit late in the instructions to do that." The trial court

noted that it had apparently included the consciousness of guilt

instruction in earlier jury instruction drafts, but it did not

appear in the final draft.  The court then referred to a previously

discarded version of the jury instructions, decided to add the

consciousness of guilt instruction and stated, "All right. I'm

going to give the additional instruction with that, because we did

hear the testimony.  I hadn't considered that, to be honest."   The

court then instructed the jury:

> Ladies and Gentleman, I'm going to read an additional
> instruction to you that originally I took out.  But I'm
> going - - I've considered the arguments of Counsel here at
> the bench.  I'm going to go ahead and put a variation of
> that back in.  So, I'm going to read it to you.  You will
> not have this in the jury room.   If during your
> deliberations you want a copy of this in the jury room,
> I'll print out a copy that doesn't have my handwriting all
> over it from the changes I've made here on the bench.
>
> Testimony has been admitted that the Defendant tampered
> with evidence.  You're instructed that tampering with
> evidence does not raise a presumption of guilt, but it may
> tend to indicate the Defendant's conscious - -
> consciousness of guilt.  If you find that these facts do
> not support the Defendant tampered with evidence, or if
> you find that some other motive prompted the Defendant's
> conduct, or if you're unable to decide what the Defendant's
> motivation was, then you should not consider this evidence
> for any purpose.  However, if you find the facts support
> that the Defendant engaged in such conduct, and if you

decide that the Defendant was motivated by a consciousness of guilt, you may, but are not required to, consider that evidence in deciding whether the Defendant is guilty of the crimes charged.  You alone will determine what weight, if any, to give this evidence.

**{¶58}** Trial courts are charged with giving juries "complete and accurate" instructions that adequately reflect the issues argued in the case before them.  *State v. Sneed*, 63 Ohio St.3d 3, 9 (1992).  "A criminal defendant has the right to expect that the trial court will give complete jury instructions on all issues raised by the evidence."  *State v. Howard*, 2007-Ohio-6331, ¶ 26 (4th Dist.).  Trial courts should ordinarily give requested jury instructions if they are correct statements of law that are applicable to the facts in the case, and reasonable minds might reach the conclusion sought by the instruction.  *Id.*, citing *Murphy v. Carrollton Mfg. Co.*, 61 Ohio St.3d 585, 591 (1991).

**{¶59}** When reviewing errors in a jury instruction, a trial court must consider a jury charge as a whole.  *State v. Brock,* 2024-Ohio-1036, ¶ 28 (4th Dist.), citing *State v. Huish*, 2023-Ohio-365, ¶ 54 (10th Dist.), citing *Cromer v. Children's Hosp. Med. Ctr.*

36

*of Akron*, 2015-Ohio-229, ¶ 35-36.  However, "[a]n unnecessary, ambiguous, or even affirmatively erroneous portion of a jury charge does not inevitably constitute reversible error." *Id.*  When a jury instruction incorrectly states the law, a reviewing court applies a mixed de novo and abuse of discretion standard of review, examining the jury charge as a whole and determining "whether the jury charge probably misled the jury in a matter materially affecting the complaining party's substantial rights."  *Id.*

Ohio Crim.R. 30(A) provides:

At the close of the evidence or at such earlier time during the trial as the court reasonably directs, any party may file written requests that the court instruct the jury on the law as set forth in the requests.  Copies shall be furnished to all other parties at the time of making the requests.  The court shall inform counsel of its proposed action on the requests prior to counsel's arguments to the jury and shall give the jury complete instructions after the arguments are completed.  The court also may give some or all of its instructions to the jury prior to counsel's arguments.  *The court shall reduce its final instructions to writing or make an audio, electronic, or other recording of those instructions, provide at least one written copy or recording of those instructions to the jury for use during deliberations, and preserve those instructions for the record.*

**{¶60}** In the case sub judice, the trial court reduced all jury

instructions, other than the consciousness of guilt instruction, to writing and submitted them to the jury for consideration during deliberation. In fact, the court offered to send in a "clean copy" of the oral consciousness of guilt instruction if requested because the court's copy contained the judge's handwriting. We conclude that any error in omitting the consciousness of guilt instruction was harmless.

{¶61} As appellee points out, in *State v. Perry,* 2004-Ohio-297, the Supreme Court of Ohio held that a trial court's failure to maintain written jury instructions with the "papers of the case" is not a structural error requiring automatic reversal. *Id.,* at syllabus. Similarly, in *State v. Cosolis,* 2002-Ohio-4302, ¶ 84 (10th Dist.), the court determined that the omission of written instructions from the record constituted harmless error when the oral instructions did not materially deviate from the written instructions. *Compare State v. Mayle*, 2015-Ohio-4838, ¶ 19, 26 (7th Dist.)(reversal and new trial required when trial court failed to provide *any* written jury instructions and the jury asked questions that indicated it did not understand certain legal

definitions.)

**{¶62}** Thus, under the facts of this case, we believe that the trial court did not err when it orally provided a consciousness of guilt instruction, but provided all other instructions to the jury in writing and offered to send in a clean copy of the consciousness of guilt instruction if requested. Accordingly, we overrule appellant's second assignment of error.

## III.

**{¶63}** In his third assignment of error, appellant asserts that the trial court erred when it denied trial counsel's request for a jury instruction that the mere presence of an accused at the scene of a crime, even with knowledge of the commission of the crime, is insufficient to convict.

**{¶64}** Trial counsel's proposed jury instruction provided: "The mere presence of an accused at the scene of a crime, even with knowledge of commission of the crime, is not sufficient to convict." The trial court indicated that the existing *Kingsland*

constructive possession instruction would make appellant's proposed instruction "repetitive." Thus, the court stated, "I think . . . to duplicate that would run the risk of causing confusion that there'd be two separate findings the jury would have to make on possession, as opposed to one."

{¶65} When instructing regarding possession, the trial court stated:

> Possession is an essential element of the offense of possession of cocaine. Possession may be actual or constructive. Actual possession exists when the circumstances indicate that an individual has or had an item within his immediate physical possession. Constructive possession exists when an individual is able to exercise dominion or control over an item, even if the individual does not have the item within his immediate physical possession. For constructive possession to exist, it must also be shown that the person was conscious of the presence of the object. Although a defendant's mere proximity in and of itself- although a defendant's mere proximity is in itself insufficient to establish constructive possession, proximity to the object may constitute some evidence of constructive possession. Thus, presence in the vicinity of contraband, coupled with another factor or factors probative of dominion or control over the contraband, may establish constructive possession. Possess - - possession may be indicated by other factors such as the availability of th drugs or the amount of the drugs. The presence of a large amount of drugs supports an inference that the Defendant may have known about the presence of the drugs and that they

exercised control over the drugs in question.  You are to examine the totality of the circumstances when considering actual and/or contrastive [sic.] possession.  Whether an inference is made rests entirely with the jury.

**{¶66}** A trial court generally has broad discretion to fashion jury instructions.  *State v. Hamilton*, 2011-Ohio-2783, ¶ 69 (4th Dist.).  However, "a trial court must fully and completely give the jury all instructions which are relevant and necessary for the jury to weigh the evidence and discharge its duty as the fact finder." *State v. Comen*, 50 Ohio St.3d 206(1990), paragraph two of the syllabus.  "Additionally, a trial court may not omit a requested instruction, if such instruction is 'a correct, pertinent statement of the law and [is] appropriate to the facts * * *.' "  *Hamilton* at ¶ 69, quoting *State v. Lessin*, 67 Ohio St.3d 487, 493 (1993). "When reviewing a trial court's jury instructions, the proper standard of review for an appellate court is whether the trial court's refusal to give a requested jury instruction constituted an abuse of discretion under the facts and circumstances of the case." *State v. Leasure*, 2015-Ohio-5327, ¶ 49 (4th Dist.), citing *State v. Ellis*, 2004-Ohio-610, ¶ 19 (5th Dist.); *State v. Newby*, 2024-Ohio-

1391, ¶ 68 (2d Dist.).

{¶67} Although the "mere presence at the scene" instruction and the "constructive possession" instruction are not necessarily interchangeable, in the case sub judice the court's general instructions to the jury clearly indicated that, for appellant to be found guilty, the jury must find that he had knowingly participated in the offenses. A trial court is not required to give a proposed instruction that is subsumed within the court's general charge. *State v. Johnson*, 140 Ohio App.3d 385, 294 (1st Dist. 2000), citing *State v. Sneed*, 63 Ohio St.3d 3, 9 (1992); *State v. Biggers,* 1992 WL 86507 (1st Dist. Apr. 29, 1992). Therefore, even if we assumed that the evidence presented at trial arguably supported the requested charge, we would find no error in the court's refusal to instruct the jury on "mere presence."

{¶68} Accordingly, we overrule appellant's third assignment of error.

IV.

{¶69} In his final assignment of error, appellant asserts that

the cumulative effect of the trial court's error created reversible error that warrants reversal.

{¶70} Under the cumulative-error doctrine, "a conviction will be reversed where the cumulative effect of errors in a trial deprives a defendant of the constitutional right to a fair trial even though each of numerous instances of trial court error does not individually constitute cause for reversal."  *State v. Garner*, 74 Ohio St.3d 49, 64 (1995), citing *State v. DeMarco*, 31 Ohio St.3d 191 (1987), paragraph two of the syllabus; *State v. Ruble*, 2017-Ohio-7259, ¶ 75 (4th Dist.); *State v. Fannon*, 2018-Ohio-5242, ¶ 124 (4th Dist.); *State v. Thomas,* 2024-Ohio-2281, ¶ 42 (4th Dist.). "Before we consider whether 'cumulative errors' are present, we must first find that the trial court committed multiple errors." *State v. Smith*, 2016-Ohio-5062, ¶ 106 (4th Dist.), citing *State v. Harrington*, 2006-Ohio-4388, ¶ 57 (4th Dist.).  However, because our review of the record did not find trial court error, the cumulative error doctrine does not apply.  Thus, we overrule appellant's fourth assignment of error.

{¶71} Accordingly, for all of the foregoing reasons, we affirm

the trial court's judgment.

JUDGMENT AFFIRMED.

44

JUDGMENT ENTRY

It is ordered that the judgment be affirmed.  Appellee shall recover of appellant the costs herein taxed.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Scioto County Common Pleas Court to carry this judgment into execution.

If a stay of execution of sentence and release upon bail has been previously granted by the trial court or this court, it is temporarily continued for a period not to exceed 60 days upon the bail previously posted.  The purpose of a continued stay is to allow appellant to file with the Supreme Court of Ohio an application for a stay during the pendency of the proceedings in that court.  If a stay is continued by this entry, it will terminate at the earlier of the expiration of the 60-day period, or the failure of the appellant to file a notice of appeal with the Supreme Court of Ohio in the 45-day appeal period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Supreme Court of Ohio. Additionally, if the Supreme Court of Ohio dismisses the appeal prior to expiration of 60 days, the stay will terminate as of the date of such dismissal.

A certified copy of this entry shall constitute that mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Smith, P.J. & Hess, J.: Concur in Judgment & Opinion

For the Court

BY:_____
                        Peter B. Abele, Judge

                    NOTICE TO COUNSEL
      Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.